■ In the Matter of ADAM NN., Alleged to be the Child of a Mentally Retarded Parent. CHEMUNG COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; JENNIFER NN., Appellant. (Proceeding No. 1.) In the Matter of ADAM NN., Alleged to be the Child of a Mentally Retarded Parent. CHEMUNG COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; FREDERICK NN., Appellant. (Proceeding No. 2.) [822 NYS2d 673]—

Crew III, J. Appeal from an order of the Family Court of Chemung County (Brockway, J.), entered December 29, 2005, which granted petitioner's application, in two proceedings pursuant to Social Services Law § 384-b, to adjudicate respondents' child to be the child of mentally retarded parents, and terminated respondents' parental rights.

Respondent Jennifer NN. (hereinafter the mother) and respondent Frederick NN. (hereinafter the father) are the biological parents of Adam NN. (born in 2003), who was removed from their care and custody shortly after his birth. Respondents consented to the initial finding of neglect and the removal of their child to foster care, where he thereafter remained. Following Adam's removal, respondents participated in weekly supervised visitations with their child. While the length and location of these visits changed over time, respondents were steadfast in their attendance. Nonetheless, due to respondents' deficient parenting skills, which showed limited improvement in the months following the child's birth, petitioner commenced

these proceedings seeking to terminate respondents' parental rights based upon mental retardation. A hearing ensued, at the conclusion of which Family Court granted petitioner's applications, finding that respondents were mentally retarded and unable to properly care for their child presently and for the foreseeable future. The mother and the father now appeal.

"Where, as here, the petitioning agency seeks to terminate an individual's parental rights based upon mental retardation, the agency bears the burden of establishing by clear and convincing evidence that the parent presently is, and for the foreseeable future will be, unable to provide proper and adequate care for the child in question due to his or her mental retardation" (*Matter of Cheryl YY.*, 302 AD2d 632, 633 [2003] [citations omitted]; *see* Social Services Law § 384-b [4] [c]; *Matter of Henry W.*, 31 AD3d 940, 941 [2006], *lvs denied* 7 NY3d 711 [2006]; *Matter of Allen DD.*, 17 AD3d 740, 741 [2005], *lv denied* 5 NY3d 704 [2005]). "[M]ental retardation," in turn, is defined as "subaverage intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior to such an extent that if [the] child were placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child" (Social Services Law § 384-b [6] [b]).

Here, respondents each concede that petitioner established mental retardation, but separately contend that petitioner failed to prove that they are unable to provide proper and adequate care for their child. For the reasons that follow, we cannot agree and, accordingly, affirm Family Court's order terminating respondents' parental rights.

Turning first to the father's appeal, although acknowledging that petitioner is not required to exercise diligent efforts to reunite the family where, as here, termination of parental rights is sought upon the ground of mental retardation (*see Matter of Michael F.*, 16 AD3d 1116 [2005]), the father nonetheless contends that petitioner did not make a sincere effort to reunite him with his child. Again, we cannot agree. Petitioner's caseworkers and the child's foster mother testified that the father was offered and attended weekly visitations with his child, during the course of which the focus was on providing him with "hands on" experience in caring for his son, i.e., diapering, bathing, changing, feeding, playing, etc. The foster mother testified that while both respondents required a fair amount of direction with regard to parenting tasks—the father in particular—the father also had to be encouraged to interact with his son. Similar testimony was offered by Deborah Nichols,

one of petitioner's assigned caseworkers, who stated that the father had not made any sustained progress with regard to parenting skills and "did not have the basics down." This testimony was echoed by Beverly Anderson, a clinical social worker with the Chemung County Association of Retarded Citizens, who provided parenting classes to respondents for over one year.[1] According to Anderson, she was unable to observe any progress with the father.

The noted lack of progress is not surprising given that Michael Morrongiello, the psychologist who evaluated the father and testified on his behalf, indicated that the father had a full-scale IQ of 50, designating him as moderately mentally retarded. On cross-examination, Morrongiello acknowledged that he could foresee several problem areas in terms of the father's parenting skills, including parental judgment and the ability to protect the child from harm and/or make constructive plans for the child—processes made more difficult by the fact that Adam has special needs.[2] Ultimately, Morrongiello conceded that a child placed in the father's home would be at risk of being neglected—a condition that could be ameliorated only by the placement of an aide in the home 24 hours a day. As Morrongiello's written evaluation of the father succinctly concludes, "[a]t IQ levels in the 50s range, it is difficult to imagine an individual having the judgment to make appropriate and sometimes rapid decisions to parent a young child."

The father also was evaluated by Jeffrey Donner, the psychologist who testified on behalf of petitioner. Donner testified that the father had a full-scale IQ of 51, again placing him in the moderately mentally retarded range. According to Donner, the father's adaptive skills were so weak that he would have difficulty living on his own, much less caring for a young child. For example, the father could learn what constituted an appropriate meal for his son, but if the child did not want to eat that particular food, the father would not be able to adjust, i.e., the father could function only within very concrete boundaries. This, in turn, led Donner to conclude that "[t]here is no question that a child in [the father's] care would be at risk" and that, in the final analysis, the father would not be able to parent his child. The foregoing testimony, in our view, constitutes clear and

1. Although the father apparently was not formally referred for services until March 2005, Anderson testified that he attended these classes with the mother from the beginning.

2. Adam has a 30% delay in gross motor skills, a 30% delay in fine motor skills and a 70% delay in language skills for which he receives physical, occupational and speech therapy on a weekly basis.

convincing evidence of the father's present and future inability to care for his child by reason of mental retardation and, as such, Family Court did not err in terminating the father's parental rights.

We reach a similar conclusion with regard to the mother. To be sure, the mother's deficits are not as profound as the father's. Her full-scale IQ is 63, placing her in the mildly mentally retarded range, she lives independently, has attended cooking classes and pays her own bills. Additionally, the record reflects that the mother understands the stages of childhood development and has a grasp of general safety issues. As Donner explained, however, the ability to pay one's bills does not readily translate into an ability to learn how to solve problems as a parent. Specifically, Donner noted that the mother has "severe attentional issues," resulting in difficulty with cognitive discipline and concentration, and "major weaknesses" in her verbal problem-solving skills. The mother's cognitive deficiencies, Donner opined, would make it hard for the mother to adjust to situations other than those to which she had learned how to respond. In other words, the mother would have difficulty coping "when the pat answers don't apply." Donner went on to explain that as a child ages and becomes more sophisticated, the parent has to possess the ability to change and adjust to the child's varying needs. When asked whether there was a program or a service that would allow the mother to do this, Donner noted that while a parenting class, for example, could help the mother learn the basics, she nonetheless must possess the ability to take the information conveyed and make appropriate judgments. As Donner testified, "There is no program that teaches that." For these reasons, Donner concluded that a child placed in the mother's care would be at a high risk of being neglected. Thus, even if we were to disregard the foster mother's testimony regarding her observations of the mother's parenting skills,[3] Donner's testimony alone is sufficient to sustain petitioner's burden of proof and warrant termination of the mother's parental rights based upon mental retardation. Respondents' remaining contentions, to the extent not specifically addressed, have been examined and found to be lacking in merit.

---

**3.** The foster mother testified that the mother at times would become frustrated with the child—particularly when changing or bathing him. Medicating the child was very difficult for the mother, and both she and the father needed to be prompted to supervise the child once he became more mobile. Both the foster mother and Rosemary Wilcox, a former community service aide for petitioner who supervised respondents' visits with their child for approximately one year, also testified that the mother consistently had to be reminded not to be so rough in her handling of the child.

Mercure, J.P., Carpinello, Rose and Kane, JJ., concur. Ordered that the order is affirmed, without costs.