■ In the Matter of ANTHONY O., a Child Alleged to be Neglected. COLUMBIA COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; SERENA O., Appellant. (And Three Other Related Proceedings.) [828 NYS2d 601]—

Carpinello, J. Appeals (1) from an order of the Family Court of Columbia County (Czajka, J.), entered January 26, 2006, which granted petitioner's application, in proceeding No. 1 pursuant to Family Ct Act article 10, to hold respondent in willful violation of a prior court order of disposition, (2) from an order of said court, entered January 26, 2006, which granted petitioner's application, in proceeding No. 2 pursuant to Social Services Law § 384-b, to adjudicate Anthony O. to be a permanently neglected child, (3) from an order of said court, entered January 26, 2006, which granted petitioner's application, in proceeding No. 3 pursuant to Social Services Law § 384-b, to adjudicate Anthony O. to be the child of a mentally retarded parent, and (4) from an order of said court, entered January 26, 2006, which granted petitioner's application, in proceeding No. 4 pursuant to Family Ct Act article 10, to adjudicate Selena O. to be neglected.

In June 2002, respondent's infant son, Anthony (born in 2002), was removed from her care, placed in petitioner's custody and thereafter adjudicated to be neglected.[1] Some 14 months later, while Anthony remained in petitioner's custody in a foster home, respondent had another child, Selena (born in 2003) (Selena and Anthony have different fathers). Although Selena was monitored during weekly home visits, petitioner did not initially seek her removal from respondent's care. In the meantime, respondent's visitation with Anthony while in foster care was sporadic,[2] she lived a somewhat nomadic lifestyle[3] and refused any treatment options that were not court-ordered.

---

1. Anthony's biological father surrendered his rights to him in June 2004.

2. Even though petitioner arranged for transportation, respondent missed more than half of her scheduled weekly visits with Anthony between June 2004 and April 2005 and only attended four of her scheduled biweekly visits between May 2005 and September 2005. When respondent did visit, no bond was observed between herself and Anthony and she had to be encouraged to play and interact with him.

3. Testimony established that respondent vacillated between her father's crowded home in Columbia County and the home of her boyfriend's family in Greene County. She failed to keep her caseworker apprised of these frequent moves or to provide a telephone number where she could be contacted.

On April 28, 2005, respondent was evaluated by a clinical psychologist. While this doctor's report was pending, petitioner filed an extension of placement and permanency petition. Citing respondent's failure to maintain consistent visitation, obtain appropriate housing and plan for Anthony's return, among other things, petitioner also indicated its intention to file a petition to terminate her parental rights so as to free him for adoption. Shortly thereafter, a report was issued detailing the psychologist's findings that respondent had an IQ of 66, placing her cognitive functioning in the mentally retarded range. This report raised serious concerns about respondent's ability to safely parent either of her children.

Thus, two separate proceedings were then commenced to terminate respondent's parental rights with respect to Anthony, one on the ground of permanent neglect and another on the ground of mental retardation. A neglect proceeding was also commenced with respect to Selena. Ultimately, Selena was removed from respondent's care and temporarily placed in the care of her biological father, who was married and lived in North Carolina. Following a combined hearing, Family Court found that Anthony was a permanently neglected child and the child of a mentally retarded parent. The court terminated respondent's parental rights as to Anthony and freed him for adoption by his foster parents. The court further concluded that Selena was a neglected child, awarded her father custody of her and permitted respondent to have supervised visits in New York four times per year. Respondent appeals.

Contrary to respondent's contention, the finding of mental retardation (*see* Social Services Law § 384-b [6] [b]) is supported by clear and convincing evidence (*see* Social Services Law § 384-b [3] [g]), namely, the uncontroverted testimony of Mary O'Connor, the clinical psychologist who evaluated her in late April 2005 (*see* Social Services Law § 384-b [6] [c], [e]). According to O'Connor, she conducted a specialized evaluation of respondent to determine her intellectual capacity to parent children. Based on testing performed during this evaluation, respondent's IQ was 66, which placed her in the mentally retarded range of intellectual functioning. Notably, this score was consistent with a prior evaluation performed by another doctor in 2002, which measured respondent's IQ as between 54 and 68 (*see Matter of Peter GG.*, 33 AD3d 1104 [2006]). Moreover, according to O'Connor, there is no treatment available to respondent to increase her IQ score.

O'Connor testified that, given her intellectual capacity, respondent would not be able to adequately parent her children.

In particular, she opined that respondent does not have the intellectual capacity to fully understand the developmental needs of her children and that she would not have the capacity to respond in an appropriate or creative manner when tested as a parent as the children got older (*see Matter of Adam NN.*, 33 AD3d 1187 [2006] [evidence that mildly retarded mother would not be able to parent as her child aged]). She also specifically opined that respondent is unable to provide safe, proper and appropriate care for Anthony presently or for the foreseeable future, an opinion that also held true for Selena. O'Connor made clear that her opinions were based not only on the results of the IQ test but also her clinical interview of respondent, respondent's past behavior and her review of collateral psychiatric and psychological reports.

To the extent that respondent insinuates that the finding of mental retardation was not established because O'Connor indicated that a "slightly higher" IQ score might have been achieved if respondent had a better attitude during the test, we are unpersuaded. As noted, O'Connor's opinions about respondent's ability to parent were not based exclusively on the results of the IQ test. Moreover, O'Connor nevertheless indicated that even with a "slightly higher" IQ score, respondent's "intellectual functioning would remain in the mentally retarded range of functioning." No countervailing psychiatric or psychological evidence was offered at the hearing (*see Matter of Joyce T.*, 65 NY2d 39, 46 [1985]; *see also* Social Services Law § 384-b [6] [e]). Given O'Connor's uncontradicted expert evidence, we are satisfied that Family Court properly determined that respondent suffers from mental retardation such that she is unable, presently and for the foreseeable future, to provide proper and adequate care for either child (*see* Social Services Law § 384-b [6] [b], [e]). Thus, as to Anthony, we affirm its order terminating her parental rights (*see Matter of Adam NN., supra; Matter of Henry W.*, 31 AD3d 940, 942-943 [2006], *lvs denied* 7 NY3d 711 [2006]; *Matter of Melissa LL.*, 30 AD3d 705, 707 [2006], *lvs denied* 7 NY3d 710 [2006]).

We are also satisfied that the record supports Family Court's alternative finding of permanent neglect with respect to Anthony. In short, despite respondent's arguments to the contrary, the record supports a finding that petitioner made the requisite diligent efforts to encourage and strengthen her parental relationship with him (*see* Social Services Law § 384-b [7] [a], [f]). Finally, given O'Connor's uncontradicted testimony concerning respondent's inability to properly and safely parent either of her children, the finding of neglect as to Selena will not be disturbed.

Mercure, J.P., Crew III, Lahtinen and Kane, JJ., concur. Ordered that the orders are affirmed, without costs.