■ In the Matter of NATASHA RR., Alleged to be a Child of Mentally Retarded Parents. COLUMBIA COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; WAYNE RR. et al., Appellants. [839 NYS2d 625]—

Lahtinen, J. Appeal from an order of the Family Court of Columbia County (Czajka, J.), entered October 12, 2006, which granted petitioner's application, in a proceeding pursuant to Social Services Law § 384-b, to adjudicate respondents' child to be a child of mentally retarded parents, and terminated respondents' parental rights.

The parties' child (born in March 2002) was removed from their home in August 2003 based upon neglect allegations, a temporary removal order was signed soon thereafter and, in

April 2004, Family Court granted petitioner's application to adjudicate the child as neglected. Respondent Wayne RR. (the child's father) appealed that order, and we reversed and dismissed the petition as to him in March 2006 (*Matter of Natasha RR.*, 27 AD3d 788 [2006]). Prior to that appeal being heard and determined, both parents had agreed in August 2004 to voluntarily extend placement for one year. They underwent several psychological evaluations and were provided many services to address their parenting shortcomings. The providers who worked with respondents reported excellent compliance with all the numerous programs, significant progress in their parenting skills, and the availability of ongoing services for them. Petitioner informed Family Court in June 2005 of its intent to return the child from foster care to the parents and a discharge from foster care protocol was submitted to the court.

Shortly thereafter, in August 2005, petitioner filed for an extension of placement and a permanency hearing requesting that the child be reunited with the parents in November 2005. After an October 2005 hearing on the petition, Family Court issued a written decision gratuitously finding that respondents were incapable of independently providing proper and adequate care for the child because of their limited intellectual capacity. Family Court's ensuing May 2006 order granted the extension, but changed the permanency plan from reuniting the child with the parents to freeing the child for adoption. Respondent Malissa SS. (the child's mother) appealed that order and, finding that Family Court applied an incorrect legal standard, we are reversing that order in a decision being decided with this appeal (*Matter of Natasha RR.*, 42 AD3d 762 [2007] [decided herewith]).

In March 2006, petitioner brought the current proceeding seeking to, among other things, terminate respondents' parental rights pursuant to Social Services Law § 384-b upon the ground of mental retardation. Following a hearing which included testimony from, among others, experts and individuals who had worked with respondents, Family Court ruled verbally from the bench. It found that the "overwhelming evidence" established that both respondents were mentally retarded and that 24-hour assistance would be necessary for these parents to keep the child from being neglected. The court went on to state that it had "no discretion . . . under the circumstances" but to grant the petition terminating respondents' parental rights. Respondents appeal.

Social Services Law § 384-b (4) (c) authorizes the termination of a parent's rights and freeing a child for adoption when the

parent is "presently and for the foreseeable future unable, by reason of . . . mental retardation, to provide proper and adequate care for a child" (*see Matter of Joyce T.*, 65 NY2d 39, 48 [1985]; *Matter of Henry W.*, 31 AD3d 940, 941 [2006], *lv denied* 7 NY3d 711 [2006]). Consonant with the constitutional requirement, the statutory elements must be established by clear and convincing evidence to terminate parental rights (*see Santosky v Kramer*, 455 US 745, 769 [1982]; *Matter of Allen DD.*, 17 AD3d 740, 741 [2005], *lv denied* 5 NY3d 704 [2005]; *Matter of Tiffany S.*, 302 AD2d 758, 759 [2003], *lv denied* 100 NY2d 503 [2003]). While the legal standard for terminating the rights of a parent who has intellectual limitations is well settled and easily set forth, applying that standard to particular facts can be excruciatingly difficult (*see Matter of Joyce T., supra* at 49 [describing as "painful" the termination of parental rights because of a parent's intellectual limitations]).

One of the experts who evaluated respondents was David Horenstein, a clinical psychologist with significant experience doing evaluations for Family Court. He had met with and conducted extensive evaluations of respondents in October 2003, July 2004 and April 2005. He submitted detailed reports and testified at both the extension hearing in October 2005 and the termination hearing in September 2006. He explained that his testing revealed that Wayne has an IQ of 72 and Malissa has an IQ of 69. These scores put Wayne in the borderline area (slightly above the general upper end score for mental retardation of approximately 70) and Malissa at the upper end of mild retardation. He noted that neither respondent had any significant psychopathy. At the extension hearing, he characterized them as "very, very motivated," observed that they had been "compliant with everything that's been asked of them" and stated that they did not have "profound deficits." He later added that they are "workable people" who "have limitations, they understand that they do, they understand that they need outside help, and are more than willing to do everything asked of them."

When Horenstein was asked at the termination hearing whether he had an opinion with a reasonable degree of clinical certainty whether respondents could provide safe and adequate care for the child, he acknowledged that he "struggled" with these issues in his report and that he continued to be impressed by the high level of respondents' motivation and cooperation. He opined that, with an extensive network of support in place, they could safely parent the child. When asked by petitioner's attorney whether 24-hour-a-day support was necessary, he responded "somebody needs to eyeball this child regularly,"

which he further quantified as "at least weekly." He was questioned by Family Court regarding emergency situations and explained that he believed they could deal with obvious emergencies but might not do as well with subtle problems.

The other expert to offer an opinion was Stephanie Tsandikos, a clinical psychologist, who had spent about one hour with each respondent. She responded to the inquiry regarding respondents' ability to provide safe and adequate care by stating that, "with extensive services in place, it might be doable," but she had "grave concern[s]." When asked about the extent of services, she indicated that her "fantasy situation" would be a family member living with them or some other situation with 24-hour help available.

There was evidence during the various proceedings that the Columbia County ARC has services available 24 hours per day to assist with family situations if either respondent called. This service was based on Wayne's continuation in the ARC program and there was some question as to whether his eligibility would continue because, ironically, his intellect level may be considered too high for the program. However, the social worker from ARC, Donna Coons, was confident that he would continue and, if not, application into the program was pending on behalf of Malissa. Indeed, Coons was so impressed with respondents' efforts and abilities that she had offered a year of personal pro bono services to assist in reuniting the family.

Others who worked directly with respondents provided similarly highly supportive testimony. These individuals included Theresa Lux, coordinator of visitation from Catholic Charities, who monitored well over 100 visits by respondents with the child and reported proper conduct, an obvious bond between respondents and the child, and respondents' ability to appropriately administer asthma medicine to the child as needed. Kelly Steinke, a family specialist from Berkshire Farms whose job included transitional services aimed toward reunification, testified to many positive observations and added that her various unannounced visits to respondents' home revealed nothing of concern. In short, the record from the extension hearing and the termination hearing are replete with testimony from these and other individuals who worked directly with respondents and reported positively on respondents' parenting abilities and the potential for a successful reuniting of the family.

Family Court's termination decision was premised in large part upon its conclusion that the testimony of the experts established that "24-hour care" would be required. If, in fact, around-the-clock extensive care from providers was the only

way the child could be safely returned to respondents, then reuniting her with her parents would be untenable (*see Matter of Kevin R.*, 112 AD2d 462, 462-463 [1985], *lv denied* 67 NY2d 602 [1986]). The record, however, does not support that factual conclusion by the requisite level of proof. Horenstein was the expert who spent the most time with respondents and his testimony reflected his admitted struggles with the case. While he believed extensive services would be needed and his testimony was at times equivocal, it is a mischaracterization of that testimony—considered as a whole—to state that Horenstein clearly set forth a need for around-the-clock monitoring or assistance. Tsandikos' suggestion of 24-hour help was characterized by her as a "fantasy situation." Termination of parental rights must be soundly based in reality and necessity, not fantasy. In any event, Tsandikos' testimony should not be the principal supporting ground to terminate respondents' rights in light of her very limited involvement with them (*see Matter of Shantelle W.*, 185 AD2d 935, 938 [1992]). The testimony of the two experts was not clear and convincing regarding the level of assistance found by Family Court.

Moreover, the record reflects that services which could be characterized as extensive were, in fact, available from several providers. Family Court did not discuss or otherwise consider these services. Efforts to provide proof at the hearing of further services—including a relative who ostensibly was willing to have respondents and the child live with him if that would help with reuniting the family—were not allowed into evidence. The current decision of Family Court appears to be premised upon the conclusion that, since respondents cannot function with total independence, they cannot have their child returned. As we explain in our decision in the appeal from the extension hearing that is being decided herewith (*Matter of Natasha RR.*, *supra*), this is not a correct legal standard (*see Matter of Commissioner of Admin. for Children's Servs. of City of N.Y.*, 254 AD2d 416, 417 [1998]; *Matter of Patricia N.*, 239 AD2d 622, 623 [1997]). The necessity and extent of ongoing services becomes one factor in a multipronged analysis, but it is not dispositive.

The gravity and seriousness of the state seeking to terminate parental rights has been repeatedly recognized and characterized as affecting a precious right " 'plain beyond the need for multiple citation' " (*Santosky v Kramer*, 455 US 745, 758 [1982], *supra*, quoting *Lassiter v Department of Social Servs. of Durham Cty.*, 452 US 18, 27 [1981]). This record does not contain clear and convincing evidence supporting termination of respondents' parental rights. The order must therefore be reversed and the petition dismissed.

Cardona, P.J., Crew III, Peters and Mugglin, JJ., concur. Ordered that the order is reversed, on the law, without costs, and petition dismissed.