Matter of Amirah P. (Aisha P.) (2020 NY Slip Op 06178)





Matter of Amirah P. (Aisha P.)


2020 NY Slip Op 06178


Decided on October 29, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: October 29, 2020

527987

[*1]In the Matter of Amirah P., Alleged to be the Child of an Intellectually Disabled Parent. Schenectady County Department of Social Services, Respondent; Aisha P., Appellant.

Calendar Date: September 10, 2020

Before: Garry, P.J., Lynch, Clark, Aarons and Reynolds Fitzgerald, JJ.


Michelle I. Rosien, Philmont, for appellant.
Christopher H. Gardner, County Attorney, Schenectady (Sarah H. Petraccione of counsel), for respondent.
Veronica Reed, Schenectady, attorney for the child.



Garry, P.J.
Appeal from an order of the Family Court of Schenectady County (Blanchfield, J.), entered November 7, 2018, which granted petitioner's application, in a proceeding pursuant to Social Services Law § 384-b, to adjudicate the subject child to be the child of an intellectually disabled parent, and terminated respondent's parental rights.
Respondent is the mother of one child (born in 2012). In September 2015, the child's pediatrician noticed signs of sexual abuse and another medical issue and recommended that respondent pursue further care with other providers. Respondent failed to bring the child to the other providers, even after multiple attempts by one of the providers and petitioner to schedule an appointment to address the alleged sexual abuse. Petitioner also received reports that respondent had routinely left the child with unknown caregivers for extended periods of time. In October 2015, petitioner obtained an order for removal of the child from respondent's custody and placed the child in foster care, where she has remained. Respondent was directed to submit to a psychological evaluation. Thereafter, petitioner offered various services, and attempts were made to obtain family support and resources to assist respondent, but these efforts were ultimately unsuccessful.[FN1] In July 2017, petitioner filed a petition seeking to terminate respondent's parental rights upon the ground of intellectual disability. Following a second psychological evaluation and a fact-finding hearing, Family Court granted petitioner's application, found the child to be the child of an intellectually disabled parent, and terminated respondent's parental rights. Respondent appeals.
An application for termination of parental rights on the basis of a parent's intellectual disability may be brought after a child has been in the care of an agency for one year immediately prior to the filing of the petition (see Social Services Law § 384-b [4] [c]). Following a fact-finding hearing, a two-part determination is required, "first of the parent['s] condition and capacity, including considerations of measures on the part of the [s]tate to maintain the family setting, and second of the anticipated effect for the foreseeable future if the child is returned to [the parent's] care" (Matter of Joyce T., 65 NY2d 39, 48 [1985]).[FN2] "[T]he petitioning agency must show, by clear and convincing evidence, that the parent is presently, and will continue for the foreseeable future to be, unable to provide proper and adequate care for the child by reason of the parent's . . . [intellectual disability]" (Matter of Logan Q. [Michael R.], 119 AD3d 1010, 1010 [2014] [internal quotation marks, brackets and citations omitted]; see Social Services Law § 384-b [4] [c]). This showing requires proof of the parent's underlying condition and testimony from a qualified psychologist or psychiatrist describing how the parent's intellectual disability affects his or her present and future ability to care for the child (see Social Services Law § 384-b [6] [c], [e]; Matter of Anthony WW. [Michael WW.], 86 AD3d 654, 655-656 [2011], lv denied 17 NY3d 897 [2011]). The Social Services Law, for purposes of such proceedings, defines an intellectual disability as that which "is associated with impairment in adaptive behavior to such an extent that if such child were placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child" under the Family Ct Act (Social Services Law § 384-b [6] [b]).[FN3]
Here, petitioner offered the testimony of David Horenstein, a licensed clinical psychologist, who evaluated respondent in November 2015 and again in July 2018. The parties consented to deeming Horenstein an expert witness in psychology. Horenstein testified that he administered a series of standardized intelligence tests, which revealed respondent's IQ score to be 67 in 2015 and 68 in 2018, which he described as "consistent with a diagnosis . . . of mild mental retardation."[FN4] He stated that respondent's school records indicated similar IQ scores — 63 and 71 — and testified that these scores provided "consistent indication[s]" of her cognitive deficits, and that these deficits will remain. Horenstein testified that respondent possessed limited judgment and reasoning skills; he indicated that she also lacked "any real insight and appreciation for the initial issue at hand" and how her actions had played a role in the child's removal. He stated that respondent believed that "she [did not] do anything wrong" and that "if any wrongdoing was done it was done on behalf of the [caregiver]," and further stated that respondent was distorting answers in order to appear more favorable.
Significantly, although Horenstein indicated that respondent could be trained to provide the child with basic and rudimentary care, like feeding and bathing the child, he concluded that, when faced with circumstances like those prompting the child's removal, she would have "an exceedingly if not impossible time trying to make the appropriate decisions" due to her cognitive deficits. On cross-examination, Horenstein admitted that assistance from family members or outside sources would "take[] the onus" off respondent to make appropriate decisions concerning the child; however, this would also require her to identify that certain situations required assistance from others, and to learn to seek help in those situations.
The 2015 and 2018 evaluations were admitted into evidence. The 2015 evaluation indicated that respondent did not have complete information, such as full names and addresses, for the individuals to whom she had entrusted the child's care for days at a time. She also tried to "excuse many of the allegations" against her, placing any wrongdoing on the caregiver and claiming that she had attempted to schedule the follow-up examination, but no appointments were available. Horenstein concluded that such reasoning was immature and inconsistent with a parent's responsibility to find safe childcare arrangements for his or her child, and that respondent failed to "understand the significance of these problems and issues, and the gravity of placing her child somewhere where [the child] might be in grave danger," which rendered her potentially dangerous to the child.
Although the 2018 evaluation stated that respondent was apologetic and insistent that her actions would not happen again, Horenstein concluded that she had failed to realize "the significance of her own failures" and that she lacked the "ability to truly understand why her errors of [judgment] and her lack of motivation in follow[-]through has raised concerns" about her ability to parent. Given respondent's "significant skill limitations, her history of exceedingly poor [judgment] and her very limited capacities for insight," he "would predict that such errors of [judgment] will occur yet again in the future."
Horenstein's expert testimony was uncontroverted; respondent did not present evidence or testify at the hearing. The evidence demonstrated that in the three years since the child had been placed in foster care, and due to her cognitive limitations, respondent had failed to recognize how her poor judgment, her lack of follow-through and her lack of insight had led to the child's removal (compare Matter of Natasha RR., 42 AD3d 769, 771 [2007], lv denied 9 NY3d 812 [2007]). Horenstein's testimony and evaluations also demonstrated that respondent's inability to learn from her errors in judgment and her lack of insight meant that she would remain unable to react appropriately to situations that may arise in the future (see Matter of Adam NN., 33 AD3d 1187, 1190 [2006], lv denied 8 NY3d 802 [2007]). This testimony and the underlying evaluations were sufficient to establish by clear and convincing evidence that respondent has an intellectual disability, and that, as a result, she is unable, both presently and for the foreseeable future, to properly care for the child (see Matter of Deborah I., 6 AD3d 771, 773 [2004]; see also Matter of Anthony O., 35 AD3d 1103, 1106 [2006]).
Lynch, Clark, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: The child's maternal grandfather petitioned for custody of the child, but subsequently withdrew his petition. Although these circumstances are unclear from the record, it is apparent upon review that substantial family aid or support was not available to respondent.

Footnote 2: A dispositional hearing is not statutorily required under the Social Services Law when terminating parental rights on the basis of intellectual disability (see Matter of Joyce T., 65 NY2d at 49; Matter of Akayla M. [Marie M.], 151 AD3d 1684, 1685 [2017], lv denied 30 NY3d 901 [2017]).

Footnote 3: This is necessarily a difficult and delicate determination. We note that the attorney for the child upon appeal, although ultimately supporting affirmance in this case, provided a cogent review of the legal requirements established by federal law for the protection of people with disabilities (see generally 29 USC § 794 [a], [b] [1] [A]; 42 USC §§ 12131 [1] [A]; [2]; 12132) and asserted the need to recognize that parents with disabilities are separated from their children at disproportionately high rates (see National Council on Disability, Rocking the Cradle: Ensuring the Rights of Parents with Disabilities and Their Children at 18-19 [2012]).

Footnote 4: Under the Social Services Law, "the phrase 'mental retardation' . . . shall be applicable to the term 'intellectual disability'" (Social Services Law § 384-b [6] [b]).